Levi Y. Eidelman (NJ Bar No. 388242021)
**CONSUMER JUSTICE LAW FIRM**
72-47 139th Street
Flushing, New York 11367
T: (718) 360-0763
E: leidelman@consumerjustice.com

*Attorneys for Plaintiff John Doe*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff,<br><br>vs.<br><br>INQUIRIES ACQUISITION LLC d/b/a SCREENID,<br><br>    Defendant. | Case No.: 2:26-cv-00878<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, intending to proceed in this action under the pseudonym John Doe ("Plaintiff" or "John Doe") by and through his counsel brings the following Complaint against Inquiries Acquisition LLC d/b/a ScreenID ("Defendant" or "ScreenID") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of an employment background check wherein Defendant published to Plaintiff's potential employer an ***expunged*** criminal record that should not have been reported in its employment-purposed consumer report.

### INTRODUCTION

1. This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

1

2. Defendant is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports generated from its database and furnishes these consumer reports to employers who use the reports to make decisions regarding whether to offer employment to certain consumers.

3. Defendant inaccurately reported to Plaintiff's employer an *expunged* criminal record that should not have been included in the employment-purposed consumer report.

4. Specifically, on or about December 4, 2025, Defendant reported a criminal case that had been *expunged* on or about April 25, 2024, by order of Essex County Superior Court Judge Marysol Rosero.

5. Plaintiff has no other criminal records to speak of.

6. Plaintiff's prospective employer rescinded Plaintiff's employment offer after receiving Defendant's report wherein Defendant published the *expunged* criminal record that should not have been reported.

7. Defendant's inaccurate reporting could have easily been avoided had Defendant performed a cursory review of the widely available public court records from Essex County, New Jersey prior to publishing Plaintiff's report to his prospective employer.

8. Had Defendant performed a cursory review of the public court records, it would have discovered that Plaintiff's criminal record does not exist in the public record, because it had been expunged more than a year prior.

9. Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

10. Specifically, Defendant does not employ reasonable procedures to prevent the inclusion of *expunged* criminal records in consumer reports.

11. Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking employment by prejudicing their prospective employers with inaccurate criminal record information.

12. Defendant's inaccurate report cost Plaintiff a good paying job and job security with the state's New Jersey Transit.

13. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment, wages, and benefits; loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

14. As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA.

**PARTIES**

15. Plaintiff, proceeding herein under the pseudonym John Doe ("Plaintiff" or "John Doe") is a natural person residing in Linden, New Jersey, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16. Defendant Inquiries Acquisition LLC d/b/a ScreenID ("Defendant" or "ScreenID") is a corporation doing business throughout the United States, including the State of New Jersey

and in this District, and has a principal place of business located at 8707 Commerce Dr, Easton, MD 21601.

17. Among other things, Defendant sells background checks to employers for their use in deciding whether to offer employment to prospective employees or to take adverse action such as termination, failure to hire, or failure to promote. These reports are provided in connection with a business transaction initiated by the employer.

18. Defendant is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for employment purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

19. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATUTORY BACKGROUND

21. Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

22. While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

23. Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

24. Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

## THE FCRA'S PROTECTIONS FOR JOB APPLICANTS

25. Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates employment background check reports like the one Defendant prepared in Plaintiff's name.

26. The FCRA provides a number of protections for job applicants who are the subject of background checks for purposes of securing employment, housing, and other purposes.

27. In the parlance of the FCRA, background checks are "consumer reports," and providers of background checks, like Defendant, are "consumer reporting agencies." 15 U.S.C. §§ 1681a(d) and (f).

28. The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

29. Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

30. Defendant disregarded its duties under the FCRA with respect to Plaintiff's background check report.

**DEFENDANT'S ILLEGAL BUSINESS PRACTICES**

31. Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data. As a result of the increasing availability of this data, there has been a boom in the background check industry.

32. As summarized in a recent report by the Consumer Financial Protection Bureau[1], a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening. CFPB Report at 4.

33. The background check industry takes in revenues in excess of three billion dollars, annually.

34. Background checks are generally created by running automated searches through giant databases of aggregated criminal record data. The reports are created and disseminated with little to no manual, in-person review, and the court records are rarely directly reviewed in creating background checks.

35. Background check companies, like Defendant, collect millions of criminal and civil records from a number of sources with data from county, state, and federal level sources. The data

---

[1] CFPB, Market Snapshot: Background Screening Reports (Oct. 2019), https://files.consumerfinance.gov/f/documents/201909_cfpb_market-snapshot-background-screening_report.pdf ("CFPB Report").

included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

36. Given that Defendant is in the business of selling background checks, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

37. Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being provided to Defendant's customers.

38. Defendant reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

39. Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

40. Appropriate quality control review of Plaintiff's report would have made clear that Defendant was reporting an *expunged* criminal record.

41. As a provider of background check reports, Defendant should be aware of the FCRA requirements and is likely a member of the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

# FACTS

**A.     Plaintiff Applies for Work with New Jersey Transit**

42.     In or around September 2025, while Plaintiff was employed as an English teacher with the State of New Jersey, Plaintiff determined that he did not find the position as fulfilling and actualizing as he had thought it would be.

43.     Additionally, the position lacked the financial stability required to meet his familial obligations. In particular, as a teacher, Plaintiff – who is the primary breadwinner for his spouse and their young daughter – felt compelled to take on a second job in order to financially sustain himself and his family.

44.     Accordingly, Plaintiff began to search for new opportunities and, in particular, he wanted to return to something akin to his old career as a commercial driver; Plaintiff anticipated that the position would permit him to earn enough to his family without needing to resort to a second job, and that would also provide him additional flexibility and opportunity to be present for his family, which he lacked while being an English teacher with a second job.

45.     In or around September 2025, after a considerable search, Plaintiff found and applied for the position of Bus Operator with New Jersey Transit.

46.     Plaintiff was excited about the position because it was a full-time driving position with reasonable hours that also provided generous state benefits and opportunities for overtime and future advancement.

47.     Plaintiff had a phone and virtual interview in or around October 2025.

48.      Plaintiff also submitted a Candidate Application, a post-interview Questionnaire, and a Disclosure Release. New Jersey Transit ran Plaintiff's Motor Vehicle Record, reviewed it, and approved it.

49. After successfully completing the interview process, Plaintiff was offered the position by New Jersey Transit.

50. As part of the application process, New Jersey Transit required that Plaintiff pass a comprehensive background check. Employment with New Jersey Transit was conditioned on Plaintiff passing the background check ("consumer report").

51. On or about November 20, 2025, Plaintiff was informed by New Jersey Transit that the background check was still pending and that he could not complete the process until it was determined that he had passed the background check.

**B.     Defendant Published an Inaccurate Background Check Report to New Jersey Transit**

52. New Jersey Transit contracted with Defendant to conduct background checks, including criminal background checks, on its prospective employees.

53. On or about October 20, 2025, in accordance with its policy, New Jersey Transit ordered a criminal background check on Plaintiff from Defendant.

54. On or about December 4, 2025, in accordance with its standard procedures, Defendant completed its consumer report about Plaintiff and sold the same to New Jersey Transit.

55. Within that consumer report, Defendant published an *expunged* criminal conviction from 2019 purportedly obtained from Essex County Superior Court in New Jersey (the "Expunged Record").

56. However, the Expunged Record had been expunged on or about April 25, 2024, by order of Essex County Superior Court Judge Marysol Rosero.

57. Therefore, the Expunged Record should have been excluded from the employment-purposed consumer report, thus rendering the report inaccurate.

58. The Expunged Record reported by Defendant about Plaintiff should not have been included in Plaintiff's employment-purposed consumer report.

59. A cursory review of the widely available public court records confirms that the Expunged Record reported by Defendant was expunged and was no longer available.

60. The sole reason the *Expunged* Record was included in the employment-purposed consumer report was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the consumer report it sold about Plaintiff to Plaintiff's prospective employer.

61. Had Defendant followed reasonable procedures, it would have discovered that the criminal record had been *expunged* and should not have been reported.

62. It is materially misleading to report an expunged criminal record in an employment-purposed consumer report. Furthermore, It is materially misleading to report an expunged criminal record in an employment-purposed consumer report while indicating that the record had been obtained from, and is existing in, Essex County Superior Court.

63. In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Plaintiff's prospective employer an *expunged* criminal record that otherwise should not have been included, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

**C.    New Jersey Transit Rescinds its Employment Offer Made to Plaintiff**

64. On or about December 15, 2025, Plaintiff was notified by New Jersey Transit that it was unable to proceed to hire him due to his criminal record as reported by Defendant. Furthermore, New Jersey Transit appeared to indicate that Plaintiff's failure to disclose the Expunged Record was also a reason why it would not proceed to a hiring action of Plaintiff.

65. Plaintiff was shocked. The only criminal record that he had had been expunged and should not have been reported.

66. Shortly thereafter, Plaintiff obtained a copy of the subject consumer report and was shocked upon reviewing and seeing the *expunged* criminal record contained within the subject consumer report.

67. Plaintiff immediately contacted New Jersey Transit and informed them that the record was *expunged* more than a year prior and should not have been included in the report in the first place.

68. Plaintiff was very panicked, confused, and concerned about the impact of the inaccurate reporting both in relation to the position with New Jersey Transit, but also the impact of the same on his future prospects.

69. Specifically, Defendant reported an *expunged* criminal record that should not have been included in Plaintiff's employment-purposed background check. The court records were available to Defendant prior to publishing Plaintiff's consumer report to New Jersey Transit, but Defendant failed to obtain or perform even a cursory review of such information.

70. Plaintiff questioned how Defendant accessed records that the New Jersey court had ordered sealed and removed from the public record, and records about which the court had declared "shall be deemed not to have occurred."

71. Further, Plaintiff had successfully passed other background checks, including, most recently, a fingerprint-based background check for a teaching position in or around July 2025, and an additional background check relating to Plaintiff's license to practice as an armed security guard.

72. Plaintiff continued to follow up with New Jersey Transit in hopes that he would still be able to salvage his employment offer; however, New Jersey Transit was clear that he had to resolve his background check issue before his employment could be again reviewed and considered.

73. On or about December 15, 2025, Plaintiff submitted a dispute to Defendant.

74. On or about December 23, 2025, Plaintiff received a dispute response from Defendant that stated, in relevant part:

> Please be advised that ScreenID re-contacted the Essex County Superior Court to reinvestigate and confirm our initial findings. The original information provided by this source has been modified.
> . . . .
> We have updated the report to reflect the information developed during the reinvestigation and have issued a revised report to The New Jersey Transit Corp.

75. The dispute response enclosed an updated copy of the background check that no longer reflected the Expunged Record.

76. Plaintiff was somewhat relieved, and he contacted New Jersey Transit in the hope that the position had not been filled by another and in the hope, as well, that he would not need to restart the lengthy application process from scratch.

77. However, New Jersey Transit did not respond for a period of days. Thereafter, on or about December 30, 2025, New Jersey Transit finally responded but insisted that it had not received an updated background report from Defendant or any dispute results.

78. Plaintiff was frustrated and also extremely alarmed; Defendant had informed him via letter that a revised background report had been issued to New Jersey Transit, but that did not appear to have occurred.

79. Plaintiff proceeded to have several conversations with Defendant and New Jersey Transit. Defendant first asserted that the revised background report had been issued and sent to New Jersey Transit, but New Jersey Transit insisted that it had not received it.

80. Finally, on Friday, January 2, 2026, Plaintiff spoke with a representative of Defendant who admitted that the revised background report had not been sent to New Jersey Transit. The representative told Plaintiff that she needed to email a different person to investigate why it had not yet been sent out.

81. Plaintiff assumed that the issue would be resolved on or about the same day. However, as of January 5, 2026, New Jersey Transit still had not received the revised and corrected background report.

82. Plaintiff called Defendant on or about January 5, 2026, and spent approximately a half-hour on the phone trying to understand why his revised report had not yet been issued. However, again, Defendant again did not provide clear answers and the call ended without resolution.

83. Plaintiff was deeply anxious and panicked that he would lose the job at New Jersey Transit.

84. On or about the same date, however, New Jersey Transit informed Plaintiff that it had received the revised and corrected background report and that it would proceed to a hiring action based on the new background report.

85. On or about January 6, 2026, Plaintiff was provided with an offer letter that indicated an employment start-date of January 22, 2026.

86. Plaintiff reasonably believes that due to Defendant's inaccurate reporting in the first instance, Plaintiff could have and would have begun employment at least a month earlier, in late-December 2025.

87. Defendant's false report almost cost Plaintiff a promising, well-paying job with New Jersey Transit, and did cost Plaintiff at least a month of employment denial and delay, and very significant emotional distress damages.

88. As well, as an employee of New Jersey Transit, Plaintiff would be paid each week, instead of semi-monthly, which is how he is paid as a teacher. Furthermore, an employee of New Jersey Transit is permitted to ride for free, and Plaintiff would not need to buy transit fare to commute to work, which is what he needs to do as a teacher.

89. Due to Defendant's unreasonable procedures in the first place and despite Plaintiff's continued efforts to seek employment, Plaintiff was unable to secure the New Jersey Transit job in a timely manner.

90. The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Defendant's conduct would have given rise to causes of action based on defamation and invasion of privacy.

91. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment, wages, and benefits; loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

92. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

93. Defendant is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

94. At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

95. At all times pertinent hereto, the above-mentioned consumer report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

96. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the consumer report it sold about Plaintiff as well as the information it published within the same.

97. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities and positions and advancements in the future; damage to his reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

98. Defendant willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

99. Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

1) Determining that Defendant negligently and/or willfully violated the FCRA;

2) Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

3) Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and

4) Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: January 28, 2026,                    */s/ Levi Y. Eidelman*
                                            Levi Y. Eidelman (NJ Bar No. 388242021)
                                            **CONSUMER JUSTICE LAW FIRM**
                                            72-47 139th Street
                                            Flushing, New York 11367
                                            T: (718) 360-0763
                                            E: leidelman@consumerjustice.com

                                            *Attorneys for Plaintiff John Doe*

16